FISH & RICHARDSON P.C.
Rodeen Talebi (SBN 320392)
talebi@fr.com
REGUS
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Telephone: (213) 533-4240

*Attorneys for Defendants*
*Ticketmaster LLC and*
*Live Nation Worldwide, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DYNAMIC TICKET SYSTEMS LLC, | Case No. 2:24-cv-00269-DDP-AJR |
| *Plaintiff,* | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR 12(B)(6) MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM** |
| v. | |
| TICKETMASTER LLC and LIVE NATION WORLDWIDE, INC., | |
| *Defendants.* | Date: June 24, 2024 |
| | Time: 1:30 p.m. |
| | Courtroom: Courtroom 10C |
| | Hon. James V. Selna |

## **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF RELEVANT FACTS ............................................. 2

III. LEGAL STANDARD ........................................................................ 5

IV. ARGUMENT ..................................................................................... 6

    A.    Claim 1 of the '207 Patent is Representative of all Claims ... 7

    B.    *Alice* Step 1: Claim 1 of the '207 Patent is directed to the Abstract Idea of Controlling and Provisioning Access .......... 9

    C.    *Alice* Step 2: Claim 1 Contains No Inventive Concept Sufficient to Transform the Abstract Idea ........................... 13

    D.    Nothing in DTS's Amended Complaint and Expert Declaration Alters the Eligibility Analysis .......................... 16

    E.    There are no Claim Construction Issues or Factual Disputes Preventing the Court from Ruling at the Rule 12 Stage ...... 20

V. CONCLUSION .................................................................................. 21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013) ....................................................................... 8

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ...................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) .......................................... 8, 15, 16

*Appistry, Inc. v. Amazon.com, Inc.*,
   195 F. Supp. 3d 1176 (W.D. Wash. 2016), *aff'd sub nom. Appistry, LLC v.*
   *Amazon.com, Inc.,* 676 Fed. Appx. 1008 (Fed. Cir. 2017) ........................... 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................... 17

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
   915 F.3d 743 (Fed. Cir. 2019)......................................... 19, 20

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
   687 F.3d 1266 (Fed. Cir. 2012) .................................... 6, 15

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ........................................ 16

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .............................. 20, 21

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ......................................................... 5, 6

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ..................................... 14

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) ................................ 13, 15

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ...................................... 14

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) ................................................................ 7, 15

*Customedia Techs., LLC v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir. 2020) ...................................................................... 13

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ............................................................... 6, 9, 10

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
   815 F. App'x 529 (Fed. Cir. 2020) ................................................................ 20

*Ebner v. Fresh, Inc.*,
   838 F.3d 958 (9th Cir. 2016) .......................................................................... 6

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ...................................................................... 15

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ................................................................ 13, 17

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016) ................................................................ 11, 12

*IPA Techs., Inc. v. Amazon.com, Inc.*,
   352 F. Supp. 3d 335 (D. Del. 2019) ............................................................... 18

*In re Killian*,
   45 F.4th 1373 (Fed. Cir. 2022) ...................................................................... 11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ................................................................................... 10

*People.ai, Inc. v. Clari Inc.*,
   Nos. 2022-1364, 2022-1366, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) .. 10

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
   No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) .... 7

*PPS Data, LLC v. Jack Henry & Assocs., Inc.*,
   404 F. Supp. 3d 1021 (E.D. Tex. 2019) ....................................................... 7, 9

*Prism Techs, LLC v. T-Mobile USA, Inc.*,
   696 F. App'x 1014 (Fed. Cir. 2017) .................................................... 10, 13, 14

*SAP Am., Inc. v. InvestPic, LLC,*
    898 F.3d 1161 (Fed. Cir. 2018) ........................................................................ 9

*Synopsys, Inc. v. Mentor Graphics Corp.,*
    839 F.3d 1138 (Fed. Cir. 2016) ...................................................................... 10

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring) .................................. 6

*Universal Secure Registry LLC v. Apple Inc.,*
    10 F.4th 1342 (Fed. Cir. 2017) ................................................................ 12, 13

*Yanbin Yu, et al. v. Apple Inc. et al,*
    Case Nos. 2020-1760, 2020-1803 (Fed. Cir. June 11, 2021) ....................... 15

**Statutes**

35 U.S.C. § 101 .......................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12 .................................................................................... 20, 21

Fed. R. Civ. P. 12(b)(6) ..................................................................... 2, 3, 20

## TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| Dynamic Ticket Systems LLC | DTS |
| Ticketmaster LLC | Ticketmaster |
| Live Nation Worldwide, Inc. | Live Nation |
| Ticketmaster LLC and Live Nation Worldwide, Inc. | Defendants |
| U.S. Patent No. 9,508,207 | '207 Patent |
| U.S. Patent No. 9,576,255 | '255 Patent |
| U.S. Patent No. 9,508,207 and U.S. Patent No. 9,576,255 | Asserted Patents |
| DTS's Amended Complaint (Dkt. 76) | Amd. Compl. |
| Declaration of Mr. Peter Quadagno (Dkt. 76-5) | Quadagno Decl. |

## I.  INTRODUCTION

The claims of the Asserted Patents are directed to the abstract idea of controlling and provisioning access and are, thus, invalid for failure to claim patent eligible subject matter under 35 U.S.C. § 101. In the context of controlling and provisioning access to ticketed events, the claims describe a form of "will-call"—picking up an event ticket at a box office window—but with a mobile device instead of a driver's license for identification. Controlling and provisioning event access in this way, absent "something more," is an abstract idea that is ineligible for patent protection under § 101.

Here, there is nothing more. The Asserted Patents' claims do not improve the functioning of any computer component. They do not rely on novel technology or combine conventional technology in surprising ways. The Asserted Patents do not even purport to be the first electronic system for controlling and provisioning access rights to events.[1] Rather, the claims simply take the idea of controlling and provisioning access rights—an act that humans have long performed—and automate it using generic technology. That cannot confer patent eligibility.

DTS's Amended Complaint attempts to delay the § 101 analysis via expert declaration from Mr. Peter Quadagno. But the Quadagno Declaration can be disregarded. Most of it simply repackages DTS's legal conclusions in an attempt to manufacture a factual dispute where none exists. The rest zooms in on two instances of technical jargon in the specification, neither of which is found anywhere in the claims. That DTS's expert declaration must go to such lengths to avoid the § 101 analysis proves Defendants' point: nothing in the Asserted

---

[1] DTS admits that "electronic ticketing and access control systems were known in the art." Quadagno Decl., ¶ 16 citing Exs. C-4 (U.S. Pub. No.: US 2010/0133339) and C-5 (U.S. Pub. No. 2012/018539).

Patents' claims goes beyond the abstract idea of controlling and provisioning access using generic components.

Consequently, resolving the issue of the Asserted Patents' eligibility does not require fact discovery or claim construction. DTS's factual allegations, even when presumed true, do not preclude dismissal. Therefore, to avoid wasting judicial and party resources unnecessarily litigating invalid patents, Defendants request that the Court dismiss DTS's Amended Complaint with prejudice pursuant to Rule 12(b)(6).

## II.  STATEMENT OF RELEVANT FACTS

The application leading to the '207 Patent was filed on September 12, 2014. The '255 Patent was filed a few months later, as a continuation-in-part to the specification of the '207 Patent.[2] The Asserted Patents' purported invention "provides a method and apparatus for providing controlled access to premises." '207 Patent at 1:50-51. There is no claimed apparatus, only a simple method consisting of the following generic steps:

First, create an "access credential" or "ticket right." The credential "may be a series of numbers and/or characters . . . it may be a QR code, bar code, readable image, fingerprint display, 2D bar code, or other indicia . . . ." '207 Patent at 5:39–44. The applicants acknowledged that barcoded tickets like this were already a conventional means of creating access credentials. '255 Patent at 1:60–2:4.

Second, "associate" or "identify" a device to be used with the ticket right. This will be the device the visitor uses for access. '207 Patent at 4:46–56. The Asserted Patents do not explain how to establish this association because it does not matter. The device can be identified any number of ways, including an "IP

---

[2] Because the Asserted Patents largely share a common specification, citations are made with reference to the '207 Patent unless indicated otherwise.

address" or "phone number, serial number, device ID, UDID, IFA, IDFA, MAC address, IMEI, MEID, ESN, or any other suitable and trustworthy manner of device identification." *Id.* at 6:22–30.

Third, "create a dynamic link" to the access credential or file representing the ticket. '207 Patent at Fig. 3, step 305. The Asserted Patents are silent as to how this "link" is implemented or what technology is used because it is merely an abstraction. It simply provides "a key to the authorized device that will facilitate access to the premises." *Id.* at 5:29–31. As DTS's expert, Mr. Quadagno, observes in its Amended Complaint: "a dynamic link is a link accessible from the user's device that points back to a ticket maintained by the issuer, wherein the ticket credentials can be modified by the issuer over time." Quadagno Decl. at ¶ 21. But how link is implemented with technology is missing from the Asserted Patents and Mr. Quadagno's explanation. They only mention, at best that a link may have an "address." '207 Patent at 5:45–48.

Fourth, "transmit" the "dynamic link" to the visitor. *Id.* at Fig. 3, step 308.

Fifth, "enable" the "dynamic link" to "activate" it and provide the credential. *See, e.g.*, '207 Patent at 6:49–51, Fig. 3 at steps 401, 402, 403, 404. Here again, the Asserted Patents disclose no new technology or novel way to use existing technology, only that it happens after the visitor attempts to "access" the link and is determined to have access. This step is thus described only by its function. *See id.* at Fig. 5. Access may be limited by time, identity of the device, the location, or other identification means. *Id.*

Finally, after presenting the credential with the device, an access control device is unlocked. *Id.*, Fig. 3 at steps 405, 406, 407. As before, the Asserted Patents offer no novel technology or details for unlocking the access control

device.[3] *Id.* at 3:62–65. The access control device is not even limited to an apparatus, as it can take the form of a security guard. *See id.* ("This may be in the form of a lock on a door or gate, or it may be a security desk that is populated by one or more security personnel.").

Other purported aspects of the invention include the ability to restrict the credentials, such as prohibiting screen shots or the saving or forwarding of the credential to others. '255 Patent at 11:37–47. And there is supposedly a "marketplace for secondary ticket sales." *Id.* at 13:65–14:53. But the Asserted Patents do not disclose any new technology to accomplish these functions or even explain how to accomplish them using existing technology. The Asserted Patents simply apply generic computer components to perform event ticketing and access control that have been carried out by humans long before their filing in 2014.

The claims are no less generic. The '207 Patent consists of 16 claims, of which only Claim 1 is independent. Claim 1 of the '207 Patent recites a method of controlling and provisioning access that consists of the functionally recited steps of (1) creating the ticket, (2) identifying a device, (3) creating a link between the right and the device, and (4) presenting the ticket to gain access.

---

[3] Worse, the Asserted Patents are inconsistent on how presenting the credential via the "dynamic link" is supposed to work. In some places, they suggest that the credential "never resides" on the visitor's device. *See, e.g.*, '207 Patent at 5:60–65 ("Because the access credential never resides on the mobile device of the member, there is no risk of access by the user once the dynamic link has been disabled.") This makes no sense. The credential must be transferred to the device for it to be "presented by the identified device" as claimed. And if the credential was not on the device there would be no concern about capturing an image of the device's screen, or forwarding the credential. *Id.* at 6:59–61. In other places, they suggest the opposite—that the credential does reside on the device. For example, the visitor "can download the indicia representing the ticket" to the device and display it. '255 Patent at 5:39–44; 13:30–33. These inconsistencies stem from the fact that the Asserted Patents deal only in the abstract, and never describe a concrete technological means for accomplishing the function of controlling access through a "dynamic link."

| Claim 1 | Step |
|---|---|
| A method of providing access to a premises comprising: | N/A |
| creating a credential to be used to unlock an access control device; | Create the ticket |
| identifying a device to be used to present the credential to the access control device; | Identify device |
| defining a dynamic link to provide the credential to the device; enabling the dynamic link by activating the link so that it is a valid link; | Link device and ticket |
| presenting the credential to the access control device and to the identified device via the dynamic link; unlocking the access control device when the credential is presented by the identified device. | Present the ticket to gain access |

The '255 Patent consists of 10 claims, of which two are independent: 1 and 10. Claim 1 is generally similar to the above as a applied to a "ticket," except the ticket also "has a charge that is determined by the location of the user at the ticketed event and the ticket holder is notified if the ticket holder moves to a location that will result in a charge to the ticket holder." Claim 10 states that "the ticket may be resold in a secondary market with price limits, time limits, and geographical limits defined by a ticket issuer."

## III.  LEGAL STANDARD

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611-12. Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive

concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and citations omitted). Transformation into a patent-eligible application requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)). If a claim could be performed in the human mind, or by a human using pen and paper, it is not patent-eligible. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

Dismissal for failure to state a claim "is appropriate if the plaintiff has not 'allege[d] enough facts to state a claim to relief that is plausible on its face.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962-63 (9th Cir. 2016) (citing *Turner v. City & Cty. Of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015)). This is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 963 (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)). Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718-19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

## IV.  ARGUMENT

The issue of § 101 validity can be evaluated from the perspective of Claim 1 of the '207 Patent because it is representative of all claims. Analysis of Claim 1 reveals that all claims of the Asserted Patents are invalid in § 101 because they

fail both prongs of the *Alice* test: the claims are directed to the abstract idea of controlling and provisioning access and do not contain an "inventive concept sufficient to ensure that the patents in practice amount to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355. Finally, no factual disputes or claim construction issues preclude the Court's determination at the 12(b)(6) stage.

### A.   Claim 1 of the '207 Patent is Representative of all Claims

When claims are "substantially similar and linked to the same abstract idea," courts may look to representative claims in the § 101 analysis. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Such is the case here. Claim 1 of the '207 Patent is representative of all claims of the Asserted Patents. *See, e.g., Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at *8-9 (E.D. Tex. Mar. 8, 2017) (invalidating 974 claims after analyzing only a few "representative claims" where the other claims were "substantially similar" and "linked to the same abstract idea"); *see also Alice*, 573 U.S. at 224-26 (invalidating over 200 claims across four patents based on two representative claims).

To begin, all independent claims of the Asserted Patents are directed to the same abstract idea of controlling and provisioning access. *See PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021, 1029–31 (E.D. Tex. 2019) (articulating that defendants first bear the burden of demonstrating a claim is representative, which then shifts to the plaintiff to identify a difference material to the § 101 analysis). Claim 1 of the '207 Patent recites a method for provisioning access through the creation, distribution, and presentation of a credential in the form of a "dynamic link." *See, e.g.* '207 Patent at Cl. 1. This occurs through the functionally recited steps of (1) creating the ticket, (2) identifying a device, (3) creating a link between the right and the device, and (4) presenting the ticket to

gain access. Claim 1 of the '255 Patent defines provisioning access in terms of the visitor's location. Claim 10 of the '255 Patent similarly recites a method for the creation, distribution, and presentation of a ticket. *See, e.g.* '255 Patent at Cl. 10. The use of the generic term "ticket" in the '255 Patent instead of "credential" also does not change the fact that both patents are both directed to this same abstract idea. *See* '255 Patent at 12:30–32 ("A ticket may be likened to a credential as described above, but for purposes of this embodiment, may be referred to interchangeably as a ticket or a credential."). Also, while Claim 10 of the '255 Patent states that "the ticket may be resold" and recites defining the "rights associated with a ticket," this merely limits the invention to a particular field of use. *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (affirming district court finding that "although the system claim associates certain computer components with some of the method steps, none of the recited hardware offers a meaningful limitation beyond generally linking 'the use of the [method] to a particular technological environment.'").

Similarly, nothing in the dependent claims alters the eligibility analysis. These claims simply recite token post-solution limitations or elements performed, at most, by computing elements that are "purely conventional," merely requiring "a generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at 2359; *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1311 (Fed. Cir. 2016) ("It is therefore well established that 'limiting an abstract idea to one field of use or adding token post solution components [does] not make the concept patentable.'") (citing *Bilski*, 561 U.S. at 612). For example:

- **'207 Patent, Claims 2–6 and '255 Patent, Claim 2**: These claims merely recite ticket limitations such as limitations by time or location or other identification means.

- **'207 Patent, Claims 7–10, 13-16**: These claims merely recite ticket presentation such as a displaying a QR code, barcode, or numeric code. *See* '255 Patent at 1:60–2:4 (recognizing conventional use of barcoded tickets).

- **'207 Patent, Claim 11**: This claim simply requires a passcode, password, or some other challenge and response like facial recognition or security questions. *See* '207 Patent at 5:28.

- **'255 Patent, Claims 3, 6–9**: These claims only add fee/resale conditions on the use, price, or resale rights of the ticket.

- **'207 Patent, Claim 12 and '255 Patent, Claims 4–5**: These claims require membership to a "private social network."

Accordingly, Claim 1 of the '207 Patent is representative for all claims for purposes of the § 101 analysis. *See PPS Data*, 2019 WL 1317286, at *5.

### B.  *Alice* Step 1: Claim 1 of the '207 Patent is directed to the Abstract Idea of Controlling and Provisioning Access

Claim 1 of the '207 Patent is directed to an unpatentable abstract idea because it claims the mere concept of controlling and provisioning access and it "can be performed in the human mind, or by a human using pen and paper." *Cyber Source Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011). In assessing whether a claim is directed to an abstract idea, courts begin by analyzing the "focus" of the claim, *i.e.*, its "character as a whole." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). Here, the focus of Claim 1 is to simply automate the process of controlling and provisioning access.

The Asserted Patents acknowledge that controlling and provisioning access is a process humans carried out long before the '207 Patent Application was filed in 2014. *See, e.g.,* '207 Patent at 1:17–46. Controlling access could be in the form of a family member at "home to receive a visitor or vendor" or "a security station that allows visitors to be signed in, checked against a list of authorized visitors . . . ." *Id.* at 1:24–39. A well-known and long-standing practice for controlling the delivery of tickets is a box office "will-call" window, where a ticket purchaser

1   can pick up a ticket purchased over the phone or Internet but only at a certain time

2   and location and with the proper identification.

3        The Asserted Patents attempt to monopolize an automated version of these

4   well-known practices. It is axiomatic, however, that "[a]utomation or digitization

5   of a conventional method of organizing human activity . . . does not bring the

6   [*19] claims out of the realm of abstractness." *People.ai, Inc. v. Clari Inc.,* Nos.

7   2022-1364, 2022-1366, 2023 WL 2820794, at \*7 (Fed. Cir. Apr. 7, 2023); *see*

8   *also Gottschalk*, 409 U.S. 63, 67; *CyberSource*, 654 F.3d at 1373; *Synopsys, Inc.*

9   *v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146-47 (Fed. Cir. 2016) (reaffirming

10  this mental process doctrine after *Alice* and *Mayo*).

11       The Federal Circuit has repeatedly affirmed that similar claims were

12  directed to unpatentable abstract ideas. For example, in *Prism Techs, LLC v. T-*

13  *Mobile USA, Inc.*, the Federal Circuit determined that claims related to systems

14  and methods to control access to protected computer resources were abstract.

15  *Prism Techs, LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016 (Fed. Cir.

16  2017). There, the claims described "(1) receiving identity data from a device with

17  a request for access to resources; (2) confirming the authenticity of the identity

18  data associated with that device; (3) determining whether the device identified is

19  authorized to access the resources requested; and (4) if authorized permitting

20  access to the requested resources." *Id.* at 1017. The Federal Circuit held that the

21  claims were "directed to the abstract idea of 'providing restricted access to

22  resources.'" *Id.*

23       Claim 1 of the '207 Patent is directed to a similar idea wherein data is used

24  for access, the access data is associated with a device, and a "dynamic link" is

25  used to present the data and permit access. *See, e.g.* '207 Patent, Cl. 1. Claim 1

26  merely uses these steps to provide access to places or services rather than access

27  to resources. *See id.* The addition of a "dynamic link" does nothing to change the

28  fact that the '207 Patent is directed to the abstract idea of controlling and

provisioning access and simply describes, in purely functional terms, providing the access data to another device.

Similarly, in *In re Killian* the Federal Circuit held that claims directed to an automated "system and method 'for determining eligibility for Social Security Disability Insurance [SSDI] benefits through a computer network'" were ineligible. *In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir. 2022). There, the patent disclosed that the "'the automated system seamlessly carries out the process of determining who is eligible . . . which frees up assigned staff to perform more traditional duties.'" *Id.* The court affirmed that the claims failed step one of *Alice* because the claims were "directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner." *Id.* at 1381. Similarly, Claim 1 of the '207 Patent merely recites the automation of controlling who has the right to access a venue—a process of "making determinations and identifications, which are mental tasks humans routinely do." *Id.* at 1379 (internal quotations omitted).

As another example, the Federal Circuit affirmed that claims directed to "collect[ing] information regarding access of a patient's personal health information, analyzes the information according to one of several rules . . . to determine if the activity indicates improper access, and provides notification if it determines that improper access has occurred" were ineligible. *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016). The court held that the claims were "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected." *Id.* at 1094. The court emphasized that "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Id.* at 1093 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)). Claim 1 of the '207 Patent is no

different. It uses data to identify whether a person has the right to enter an area with their ticket. That Claim 1 generates generic credentials and links that data to device still falls within the abstract-idea category of "mental processes." *Id.* at 1093. Defining whether an individual has the right to access a particular area is an activity that even the Asserted Patents admit has long been performed by humans. *See* '207 Patent at 1:41-44 ("[T]here may be a security station that allows visitors to be signed in, checked against a list of authorized visitors, and provided escorted access to the premises.").

While DTS pleads that the Asserted Patents encompass improvements such as controlling the "who, what, where, when and how" a ticket is used, providing safeguards against forgery, or maintaining control of ticket credentials, these allegations are insufficient avoid the abstract nature of the Asserted Patents. *See* Amd. Compl. at ¶¶ 22–33. For example, in *Universal Secure Registry LLC v. Apple Inc.*, the Federal Circuit held that patents directed to "an identification system [enabling] a person to be identified or verified . . . and/or authenticated without necessitating the provision of any personal information" were ineligible under § 101. *See Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1348 (Fed. Cir. 2017) (internal citations omitted). The *Universal Secure Registry* patents facilitated access to a secure system through a "user's electronic ID device, which may be a smart card, cell phone . . . or other commonly available electronic devices" and utilized a "time-varying multicharacter code" to "access a database that indicates any restrictions on the user's transactions." *Id.* Nevertheless, the Federal Circuit found that the claims were directed to an abstract idea and merely recited "receiving a transaction request, verifying the identity of a customer and merchant, [and] allowing a transaction." *Id.* at 1349.

Here, Claim 1 of the '207 Patent recites similar steps of using a generic mobile device and an associated "link" to define the users rights and allow or deny access as a result. Regardless of the alleged benefits, the language of Claim

1 makes it clear that the claims of the Asserted Patents are directed to the abstract idea of controlling and provisioning access. *See id.* at 1351 (finding another patent ineligible that recited  "authenticat[ing] the user based on a combination of two or more of (1) something the user knows (e.g., PIN number); (2) something the user is (e.g., a biometric measurement as detected by a biometric sensor); (3) something that the user has (e.g., cell phone serial number); and (4) an account selected by the user for the current transaction.") (internal quotations omitted); s*ee also Prism Techs.*, 696 F. App'x at 1017.

Claim 1 is thus unlike those that have been found eligible at *Alice* step 1 for their ability to improve the functioning of computers. In *Enfish*, for example, a claim that recited "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory" was found non-abstract because it improved the way computers operated and handled data, allowing for more efficient database functions. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). No such improvement is recited in the claims of the Asserted Patents. *See TLI Commc'ns*, 823 F.3d at 615; *see also buySAFE, Inc. v. Google*, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014). Rather, Claim 1 simply invokes computers as a tool to carry out the abstract idea of controlling and provisioning access, which cannot confer patent eligibility.  *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020). ("[I]t is not enough, however, to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool.")

### C.   *Alice* Step 2: Claim 1 Contains No Inventive Concept Sufficient to Transform the Abstract Idea

Claim 1 of the '207 Patent also fails step two of *Alice* because it does not contain an "inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). "If a claim's only 'inventive concept' is the application of an abstract

idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

Such is the case here: Claim 1 recites a series of functional steps facilitated by conventional components and a "dynamic link" that is defined only by its generic function. The specification confirms that each of the functional steps is to be carried out by generic computer hardware and software operating in their conventional fashion. *See* § II, *supra*. Claim 1 is, in other words, "simply an abstract-idea-based solution implemented with generic technical components in a conventional way." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 775 (Fed. Cir. 2019). Merely applying the abstract idea of controlling and provisioning access using conventional and well-understood techniques "[a]s a matter of law . . . does not add 'significantly more[.]'" *BSG Tech*, 899 F.3d at 1290-91.

For example, in *Prism Tech.* the plaintiff argued that the inclusion of "identity data" "represent[ed] a specific and novel solution to a real problem and provides real benefits." *Prism Tech.*, 696 F. App'x at 1017. The plaintiff alleged that by combining the components of an authentication server, access server, Internet Protocol Network, client computer device, and database, with hardware identity data yielded a "novel, effective solution to real-word problems, which industry came to adopt" years later. *Id.* at 1018. However, the Federal Circuit concluded that this does not rise to the level of an inventive concept and that there was no indication that the inclusion of identity data produces "'a result that overrides the routine and conventional' use of a known feature." *Id.* (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014)). The Federal Circuit concluded that even as an ordered combination, the asserted claims recited "no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner." *Id.* Similarly, the Asserted

-14-

Patents in this case describe generic components which are directed at the abstract idea of controlling and provisioning access. The inclusion of a "dynamic link," which at most facilitates the transfer of data, merely acts in functional manner to accomplish that abstract idea.

Courts routinely hold that use of generic computer hardware and software to send and display information does not make an otherwise abstract idea patent eligible. *See, e.g., buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). ("That a computer receives and sends the information over a network— with no further specification—is not even arguably inventive."); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("At most, [the] claims attempt to limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment. Such a limitation has been held insufficient to save a claim in this context."); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canad*a (U.S.), 687 F.3d 1266, 1278 (Fed. Cir. 2012). Put another way, there is "[n]othing in the claims" that "requires anything other than off-the-shelf, conventional computer . . . technology" to carry out the abstract idea. *Elec. Power Grp.*, 830 F.3d at 1355; *Yanbin Yu, et al. v. Apple Inc. et al*, Case Nos. 2020-1760, 2020-1803, at 9-10 (Fed. Cir. June 11, 2021) ("[T]he claimed hardware configuration itself is not an advance and does not itself produce the asserted advance of enhancement . . . [which] is an abstract idea. The claimed configuration does not add sufficient substance to the underlying abstract idea of enhancement—the generic hardware limitations of claim 1 merely serve as a conduit for the abstract idea.").

Finally, Claim 1 is readily distinguishable from those determined to be patent eligible at *Alice* step 2. In *Amdocs*, the Federal Circuit held that the claimed invention was patentable because, while the elements individually required "arguably generic components," they involved an "unconventional technological

solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)" and "depend[ed] upon the invention's unique distributed architecture." *Amdocs (Israel) Ltd. v. Openet Telecom*, Inc., 841 F.3d 1288, 1300-03 (Fed. Cir. 2016); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (holding that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces" to provide a technology-based solution). Claim 1 of the '207 Patent, in contrast, recites no unique or non-conventional combination of elements. With no inventive concept beyond the abstract idea of controlling and provisioning access, the Asserted Patents fail both prongs of the *Alice* inquiry.

### D. Nothing in DTS's Amended Complaint and Expert Declaration Alters the Eligibility Analysis

DTS's Amended Complaint introduces several irrelevant and conclusory allegations supported by an "expert" declaration to delay the ineligibility analysis. *See generally*, Quadagno Decl. But, for several reasons, nothing in the Amended Complaint or the corresponding Quadagno Declaration alters the § 101 eligibility analysis.

To begin, Mr. Quadagno's purported expertise is unrelated to the subject matter relevant to the Asserted Patents. Mr. Quadagno's educational background is in chemistry and business (Quadagno Decl. at ¶ 6), while his work experience relates exclusively to the management of various mobile payments endeavors (*id.* at ¶ 7). Mr. Quadagno demonstrates no expertise in the fields of access control or event ticketing. Indeed, as Mr. Quadagno's CV states, he is "[n]ot a software engineer but states that he is fully qualified to understand the computer systems methods and process flows of the patents-in-suit." *Id.* at 11. Mr. Quadagno's conclusory pronouncements about the alleged novelty of a ticketing technology

with which he is unfamiliar and an industry in which he does not practice do not rise to the level of plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Even if he were qualified, however, the Quadagno Declaration can be disregarded at the pleadings stage because the Court is under no obligation to accept conclusory and self-serving legal opinions as true. *See id.* ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Courts in patent cases have characterized such arguments as "nonsense." *Appistry, Inc. v. Amazon.com, Inc.,* 195 F. Supp. 3d 1176, 1183 (W.D. Wash. 2016)*, aff'd sub nom. Appistry, LLC v. Amazon.com, Inc.,* 676 Fed. Appx. 1008 (Fed. Cir. 2017). In *Appistry*, the plaintiff's "Complaint include[d] the declaration of Dr. Matthew Green (or allegations regarding the same topics), who opine[d] that the claims . . . cover[ed] 'a new and novel mechanism, system, and/or method over the prior art for distributed computing.'" *Id*. The court was clear about the impropriety of the plaintiff's tactics:

> Plaintiff's position is absurd. Requiring the Court to accept such facts or legal conclusions (even in the form of an early expert declaration) would permit any plaintiff to circumvent the § 101 inquiry on an early motion to dismiss or motion for judgment on the pleadings simply by including a few lines attesting to the novelty of the invention.

*Id*. at n.6.

Such is the case here. For example, the Amended Complaint builds upon a bare allegation in the Original Complaint invoking *Enfish* (an *Alice* Step 1 consideration) alleging that the Asserted Patents "resolve technical problems related to ticketing and access control systems . . . ." Amd. Compl. at ¶ 20. The supporting "evidence," however, is simply a conclusory legal opinion in the Quadagno Declaration. *See* Ex. 1 at § I (*comparing* Original Compl. at ¶ 35 *with* Amd. Compl. at ¶ 20 *and* Quadagno Declaration at ¶ 15).

As another example, DTS's Amended Complaint pads an allegation from the Original Complaint about the "technical problems" allegedly resolved by the

Asserted Patents with citations to the Quadagno Declaration. Amd. Compl. at ¶ 21. But again, the corresponding paragraphs of the Quadagno Declaration are wholly conclusory. *See* Ex. 1 at § II (*comparing* Original Compl. at ¶ 38 *with* Amd. Compl. at ¶ 21 *and* Quadagno Declaration at ¶ 16).

Similarly, the Amended Complaint expands on existing allegations in the Original Complaint about the alleged technological improvement to computers embodied in the "dynamic link" with citations to the Quadagno Declaration. Amd. Compl. at ¶¶ 26–27. Yet, these citations do nothing more than describe the "dynamic link" in a purely functional manner. *See* Ex. 1 at § III (*Comparing* Original Compl. at ¶¶ 32–33 *with* Amd. Compl. at ¶¶ 26–27 *and* Quadagno Declaration at ¶¶ 22–23). To the extent the Quadagno Declaration relies on the Asserted Patents in support of its legal conclusions, these citations simply describe the desired functions of the dynamic link:

- **'255 Patent at 9:43–45**: "The creator of a credential will have the ability to set granular controls, permissions, and limitations on the use and accessibility of the credentials or digital asset."

- *Id.* **at 10:35–41**: "The Device Limits setting may be used to restrict access to the credentials link to a type of device either generically (e.g. a Smart-phone), by producer (e.g. an Apple device), or even to restrict access to a single device, by tying access to a particular UDID or some other indicia that can be used to reliably identify a particular device."

- *Id.* **at 11:26–28**: "At decision block 1006 it is determined if there is a device requirement for access, and if so, whether the user is accessing the link on the correct device."

Ultimately, the Amended Complaint and Quadagno Declaration "does nothing more than recite language in [the Asserted Patents] that [this Court] already considered and determined is directed to the abstract idea." *IPA Techs., Inc. v. Amazon.com, Inc.*, 352 F. Supp. 3d 335, 346 (D. Del. 2019).

Finally, the Amended Complaint advances a new argument highlighting two disclosures in the specification referring to "inodes" and "two-phase commit" to contend that the dynamic link is not merely functional. *See* Ex. 1 at § IV (*Comparing* Amd. Compl. at ¶¶ 28–30 *with* Quadagno Declaration at ¶¶ 24–26). The problem here is two-fold.

First and most obviously, neither of these terms is used in, or even alluded to, in any claim. *See* '207 at Cls. 1-16; '255 Patent at Cls. 1-16. In fact, the "inode" term appears only in the '255 Patent specification. It is not featured in the '207 Patent specification at all. *Id.* A conclusory declaration that relies on disclosures not recited in the claims is insufficient to confer patent eligibility. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 756 (Fed. Cir. 2019) (finding that the district court was not obliged to accept expert allegations as true where "[n]one of these details are recited ***in the claims*** of the '820 patent: ***no claim*** requires breaking MuSK into fragments . . . ***no claim*** is limited to a particular MuSK binding site; and ***no claim*** recites any detail with respect to immunoprecipitation.") (emphasis added). Accordingly, this Court is not required to accept these new and untethered allegations as true.

Second, to the extent that the Quadagno Declaration is suggesting that these unclaimed features imply that the claims require anything other than generic components used in the conventional manner, it would be in direct contradiction to the intrinsic record of the Asserted Patents. As detailed in § II, *supra*, the Asserted Patents are clear that the alleged invention relies exclusively on conventional means for:

- Creating access credentials. '207 Patent at 5:39–44; '255 Patent at 1:60–2:4.
- Associating or identifying devices. '207 Patent at 4:46–56, 6:22–30.
- Creating a "dynamic link." *Id.* at 5:45–48.
- Enabling the "dynamic link." *Id.* at 6:49–51.

-19-

- And unlocking the access control device. *Id.* at 3:62–65.

Thus, "[b]ecause [DTS's] expert declaration made allegations inconsistent with the [asserted] patent, the district court [i]s not obliged to accept them as true." *Athena*, 915 F.3d at 755-56.

### E.    There are no Claim Construction Issues or Factual Disputes Preventing the Court from Ruling at the Rule 12 Stage

The issue of patent eligibility is ripe for the Court's consideration because there are no claim construction issues precluding resolution at Rule 12. No construction of any term of Claim 1 of the '207 Patent alters the fact that it is focused exclusively on, and ultimately directed to, the abstract idea of controlling and provisioning access.

There are also no factual disputes on this record precluding resolution on the pleadings. As noted above, the Court need not credit the conclusory allegations in DTS's Complaint. *See Simio*, 983 F.3d at 1365 ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)."); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (internal quotations omitted) ("allegation[s] about inventiveness, wholly divorced from the claims or the specification, do[] not defeat a motion to dismiss; only plausible and specific factual allegations that aspects of the claims are inventive are sufficient.").

This case is thus unlike *Berkheimer* wherein the Federal Circuit found Rule 12 to be inappropriate. In *Berkheimer*, the specification explicitly "describe[d] an inventive feature that store[d] parsed data in a purportedly unconventional manner." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). The court noted that "[t]he improvements in the specification, ***to the extent they are captured in the claims***, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities . . . so we must analyze the asserted claims and determine whether they capture these

-20-

improvements." *Id.* (emphasis added). No such inventive feature is described in the specifications of the Asserted Patents, much less captured in representative Claim 1 of the '207 Patent. Accordingly, this issue is ripe for the Court's consideration at the Rule 12 stage.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss DTS's Complaint for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, Defendants request dismissal with prejudice.

Dated: May 23, 2024

By: /s/ Rodeen Talebi

**FISH & RICHARDSON P.C.**
Rodeen Talebi (SBN 320392)
talebi@fr.com
REGUS
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Telephone: (213) 533-4240

Neil J. McNabnay *(pro hac vice)*
mcnabnay@fr.com
David B. Conrad *(pro hac vice)*
conrad@fr.com
Michael R. Ellis *(pro hac vice)*
ellis@fr.com
Alexander H. Martin *(pro hac vice)*
martin@fr.com
1717 Main Street, Suite 5000
Dallas, TX 75201
Telephone: (214) 747-5070

*Attorneys for Defendants*
*Ticketmaster LLC and*
*Live Nation Worldwide, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,987 words, which complies with the word limit of L.R. 11-6.1.

May 23, 2024.

/s/ Rodeen Talebi
Rodeen Talebi